## KNICKERBOCKER TRUST CO. v. DAVIS.

### (Circuit Court, D. New Jersey. February 17, 1906.)

CORPORATIONS—SUBSCRIPTIONS FOR BONDS—CONSTRUCTION OF SYNDICATE AGREEMENT.

A syndicate agreement recited that a corporation had authorized an issue of $200,000 of bonds, and each subscriber signed and delivered to the syndicate managers a certificate by which for himself alone he agreed to take and pay for by a date fixed a certain number of such bonds at a stated price, for which he was also to receive a certain amount of the stock of the corporation; such certificates being payable to the managers or their order. The agreement also authorized the managers to obtain a loan from plaintiff trust company and to pledge the underwriting certificates and the bonds and stock called for therein as security therefor, and each subscriber guarantied payment of a part of the loan equal to the face value of his certificate, such payment to be a fulfillment of his subscription and to entitle him to the bonds and stock subscribed for. *Held*, that the subscriptions were several, and that plaintiff, having made a loan as contemplated, was entitled to enforce the guaranty against a subscriber, without reference to whether or not the entire authorized issue of bonds had been sold; there being no such requirement in the agreement.

## On Rule to Show Cause Why a New Trial Should Not be Granted.

On January 6, 1903, a written agreement was entered into by the Consolidated Industries Company, designated in the agreement as "syndicate

managers," and the several individuals signing the agreement, designated as "underwriters." The agreement, in its preamble, contained a number of recitals setting forth that the Consolidated Gas & Electric Company would rebuild its gas and electric plant, extend its mains for gas and electric supply, and erect coke ovens, by the purchase of real estate and the making of other improvements specified in the recitals; that it was estimated that the earnings of the Consolidated Gas & Electric Company for the year ending May, 1904, would be over $100,000; that on the basis of 65 per cent. of the earnings for operating expenses there would remain 35 per cent., as a net revenue, which would be sufficient to provide for the payment of the annual fixed charges of the company and also of a dividend of 6 per cent. on its capital stock; that the total capital was 2,000 full-paid shares, of a par value of $100 each; that an issue of $300,000 of 5 per cent. consolidated refunding sinking fund gold bonds had been authorized, which would fall due in 35 years from their date; that $100,000 of the bonds and currency in excess of $21,700 were reserved for redemption purposes; that the bonds were deposited with the New York Security & Trust Company, trustee, and the currency with the Rochester Trust Company, trustee; that the Consolidated Industries Company, "in order to obtain funds for the purpose set forth herein, has undertaken to and has organized an underwriting syndicate, and has agreed and hereby does agree to act as the managers of the said consolidated Gas & Electric Company's underwriting syndicate"; and that "each underwriter, each for himself, but not for the others, for the purpose of better aiding in obtaining the funds sought for, has duly executed and signed and delivered to the syndicate managers of said underwriting syndicate certain underwriting certificates in the denomination of $825 each, to the aggregate amount set opposite his signature hereto, said certificates being substantially in the following form:

"Underwriting Certificate.

"—————————, 190—.

"On January 10th, 1904 (or at any time on or before four months from date hereof, at my option), I promise to pay the Consolidated Industries Company, or to their order, by indorsement hereof, the sum of eight hundred and twenty-five dollars, in consideration of which, it is agreed by all parties hereto, I shall receive from the payee one thousand dollars par value in the consolidated refunding sinking fund 5 per cent. 35-year gold bonds of the Consolidated Gas & Electric Company, of Batavia, New York, of an authorized issue of three hundred thousand dollars, and three hundred dollars par value of the capital stock of the said Consolidated Gas & Electric Company, of Batavia, New York, of an authorized issue of two hundred thousand dollars, the payment of said sum by me and delivery of said certificates to me to be made at the office of ——— on (or on or before four months from the date hereof, at my option) January 10th, 1904.

"—————————.

"No. ————."

After the above-mentioned recitals the agreement sets forth that in consideration of the premises the Consolidated Industries Company, for themselves and as managers of the syndicate, and for each and every member of the syndicate, agreed to carry out faithfully and to their utmost ability the following provisions:

(1) That during the period ending January 10, 1904, the syndicate managers would endeavor to market the bonds held under the agreement for the pro rata benefit of all the underwriters at a net price to them of $925 per bond, without deduction for expenses or commissions, the excess received by the syndicate managers to go to them as their compensation for effecting the sales.

(2) That each member of the syndicate should be liable only for his pro rata share of the bonds, if any, which remained unsold on January 10, 1904.

(3) That no underwriter should be liable to the syndicate managers for any sum of money unless he should receive in exchange, for each certificate

for $825 signed by him, $1,000 in said mortgage bonds of the Consolidated Gas & Electric Company and $100 in cash on his pro rata share of the bonds previously sold, and the full amount of stock bonus to which he was entitled on the total amount of his subscription.

(4) That each member should have the privilege, within four months from the date of the agreement, of withdrawing his bonds and stock loans, or any unsold portion thereof, to which he might be entitled, from the syndicate for investment, at the underwriting price of 82½ cents on the dollar, upon agreeing not to offer or sell any of such securities for a period of one year from the date of the withdrawal.

(5) That the syndicate should be dissolved within 10 days after the maturity and payment of the last obligation outstanding for the account of the syndicate.

(6) "The several underwriters hereby agree that the syndicate managers may borrow from the Knickerbocker Trust Company, New York, or any other party, up to the aggregate amount of all of said underwriting certificates, and may pledge to said trust company or such other party the said certificates and bonds and shares of stock therein mentioned, and each underwriter, in consideration of the making of said loan, hereby guaranties to the said trust company, or such other party, the repayment of said loan to the extent only of the par of the underwriting certificates signed by him and so pledged. All payments made on account of such guaranties shall to that extent cancel such underwriter's obligation upon the said underwriting certificates. This agreement shall be filed with the said trust company or such other party to evidence such guaranties."

(7) "This instrument may be executed in any number of counterparts to the same effect as if all the signatures were upon one original."

The defendant signed one of the counterparts of the above-mentioned agreement for the sum of $4,125, and five underwriting certificates of the form above set forth, each for $825, amounting also, it will be observed, to the sum of $4,125. The plaintiff brought suit against the defendant on his guaranty set forth in the sixth paragraph of the agreement, and at the trial proved the execution of the agreement by the Consolidated Industries Company and the defendant, the five underwriting certificates signed by the defendant, the loan by the Knickerbocker Trust Company to the Consolidated Industries Company of the sum of $51,975, and the deposit by the Consolidated Industries Company with the Knickerbocker Trust Company, as collateral to secure $4,125 of the above-mentioned loan, the five underwriting certificates signed by the defendant, and five of the mortgage bonds and certificates, for the proportion of the capital stock to which, upon the payment of the five underwriting certificates, the defendant would be entitled. The plaintiff's proofs further showed that the total subscription by underwriters for the mortgage bonds amounted to $63,000 only, and that the total amount loaned by the Knickerbocker Trust Company was 82½ per cent. of the total subscription, being the above-mentioned sum of $51,975. The defendant offered no evidence. The court thereupon instructed the jury to render a verdict for the plaintiff, and, in order that the question of law raised at the trial might be more deliberately considered than was then possible, granted, upon the application of the defendant, a rule to show cause why a new trial should not be allowed. The present argument is on that rule.

McCarter, Williamson & McCarter and Julien T. Davies, Jr., for plaintiff.

William H. Speer and Charles Snow Kellogg, for defendant.

LANNING, District Judge (after stating the facts). The question presented in this case calls for a construction of the syndicate agreement set forth in the preceding statement. The defendant insists that no subscriber for bonds could become liable under the agreement, or upon any of the underwriting certificates, unless and until

200 of the bonds should be subscribed for. The plaintiff, on the other hand, insists that each of the subscribers for the 63 bonds who did not at maturity pay the underwriting certificates signed by him became liable thereupon in an action at law. No other question is presented.

It will be observed that in the underwriting certificate the promise is to pay on January 10, 1904 (or, at the signer's option, at any time before that date), to the Consolidated Industries Company, or to their order, $825 upon the receipt of one of the mortgage bonds for $1,000 and of capital stock of the par value of $300 issued by the Consolidated Gas & Electric Company. The five certificates signed by the defendant were indorsed over to the Knickerbocker Trust Company, on which, with other securities, the Knickerbocker Trust Company made its loan of $51,975. By one of the recitals to the agreement the defendant had expressly declared to the Knickerbocker Trust Company, with whom the agreement was deposited pursuant to the provisions of the last clause in its sixth paragraph, that the Consolidated Industries Company had already organized an underwriting syndicate, and that for the purpose of better aiding in obtaining the funds sought for he had duly executed and signed and delivered to the syndicate managers certain underwriting certificates, in the denomination of $825 each, to the aggregate amount set opposite his signature. In the sixth paragraph of the agreement, he had individually authorized the syndicate managers (for the agreement is a several one) to borrow from the Knickerbocker Trust Company "up to the aggregate amount of all of said underwriting certificates," and to pledge with the trust company the certificates and the bonds and shares of stock therein mentioned, and that he thereby guarantied to the trust company the repayment of the loan it should make under the terms of the agreement to the extent of the par value of the underwriting certificates signed by him and so pledged. There is nothing in the agreement that justifies the restricted construction for which the defendant contends. The Knickerbocker Trust Company was not a party to the syndicate agreement. That agreement, in counterparts, showing subscriptions to the amount of $63,000, was deposited with the Knickerbocker Trust Company. It showed that $63,000 of the bonds were subscribed for by different individuals. These individuals constituted the syndicate referred to in the agreement, and each of them by the terms of the agreement became an underwriter for the amount of each of the underwriting certificates signed by him.

The case of Bray v. Farwell, 81 N. Y. 600, which is the only case cited by the counsel for the defendant on the argument or in their brief, is not at all applicable to the facts of the case before me. There the Court of Appeals of New York held that a subscriber to shares of a joint-stock association having a capital fixed at $3,000,000, divided into 30,000 shares, whose articles of association contained no provision for the commencement of its business before the whole of the capital stock was subscribed, could not enforce an assessment upon a holder of its shares when it appeared that all the shares had not been taken and that that holder had not attended any meetings of the shareholders

or assented to the commencement of business by the association. When the present case was before this court on a motion to strike out pleas, it was held by Judge Cross (see 139 Fed. 792) that the contract of guaranty was unconditional. I agree with the view thus expressed by my associate. The contract contains no condition that the underwriting certificates shall be unenforceable unless the subscriptions to the bonds should amount in the aggregate to the sum of $200,000.

The rule to show cause must be discharged.